**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL, INC.; and INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA (UAW), | ) ) ) ) ) ) | 22-cv-3442 |
| Plaintiff, | ) ) ) | |
| v. | ) ) | |
| LOUIS DEJOY, in his official capacity as U.S. Postmaster General; and U.S. POSTAL SERVICE, | ) ) ) ) | |
| Defendants. | ) ) ) ) | |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**INTRODUCTION**

1.      This case is about the U.S. Postal Service's failure to comply with the National Environmental Policy Act (NEPA) in its acquisition of thousands of Next Generation Delivery Vehicles. The Postal Service's Final Environmental Impact Statement (EIS) supporting that acquisition is deficient at every step. The Postal Service signed a contract to purchase vehicles before undertaking environmental review. It failed to evaluate reasonable alternatives. It made irrational assumptions about the future prices of gasoline, electricity, and electric vehicles. It committed to buying a new fleet of gas-powered vehicles without considering greenhouse gas emissions. And when commenters—including the Environmental Protection Agency (EPA) and the Council on Environmental Quality (CEQ), two fellow government agencies—pointed out

these errors, the Postal Service quickly doubled down in a flawed Record of Decision (ROD) based on the woefully inadequate EIS.

2.      In light of these failures, plaintiffs Natural Resources Defense Council, Inc. (NRDC) and the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW) challenge the U.S. Postal Service's final EIS for Purchase of Next Generation Delivery Vehicles. *See* 87 Fed. Reg. 994 (Jan. 7, 2022) (notice of availability).

3.      The Postal Service owns and operates a fleet of roughly 212,000 delivery vehicles, most of which were designed and built specifically for the Postal Service. These purpose-built vehicles have exceeded their expected service lives, average over $5,000 per vehicle in annual maintenance costs, and lack basic features such as airbags and anti-lock brakes. Shifting delivery needs, including increases in parcels and decreases in letter volume, also no longer match what the vehicles were designed for. As a result, the Postal Service has decided to replace this aging fleet with new delivery vehicles.

4.      Replacing the Postal Service fleet is a historic opportunity to put electric vehicles (EVs) and related charging infrastructure in every community in the country. The transportation sector accounts for the largest share of greenhouse gas emissions in the United States. Vehicles with internal combustion engines also emit large quantities of other air pollutants such as nitrogen oxides, which contribute to the formation of both particulate matter pollution and ground-level ozone, the main ingredient in smog. Investing in EVs would substantially mitigate the harmful pollution caused by the Postal Service's operations.

5.      The Postal Service began the process of replacing its aging delivery vehicle fleet when it issued a request for information in January 2015. It then ordered prototypes based on

manufacturers' bids for internal combustion, hybrid, and plug-in electric vehicles. And on February 23, 2021, it announced that it had selected Oshkosh Defense ("Oshkosh") for a ten-year contract to produce up to 165,000 new vehicles, beginning in 2023. At that time, the Postal Service provided Oshkosh with an initial $482 million task order covering February 2021 to August 2023. Some of that funding is designated for outfitting a new assembly plant. In June 2021, Oshkosh publicly announced that it will open a dedicated facility in South Carolina to produce new vehicles for the Postal Service.

6.      After issuing and funding the vehicle contract, the Postal Service belatedly began to evaluate the environmental impacts of its new vehicle acquisition under NEPA. The Postal Service issued a draft EIS on August 26, 2021. 86 Fed. Reg. 47,662 (Aug. 26, 2021). The draft's preferred alternative was to purchase up to 90% internal combustion vehicles, and a minimum of 10% EVs, over ten years. Based on an assumption that an EV designed specifically for the Postal Service would have a range of 70 miles on a single charge, the EIS projected that all but 12,500 routes, or about 5% of total routes, could be served by EVs. The draft considered and rejected all commercially available "off the shelf" EVs, reasoning that because they were all left-hand-drive vehicles, they could not support curb-side delivery. The draft did not consider impacts from the production, as opposed to the operation, of the Postal Service's custom-built vehicles. Likewise, the draft did not disclose that the vehicles would be produced in South Carolina or consider impacts related to the location of production.

7.      Public comments poured in identifying flaws in the Postal Service's analysis, including from Plaintiffs. Plaintiffs criticized the Postal Service for missing an opportunity to increase the number of EVs in the fleet by guaranteeing that only 10% of new delivery vehicles will be electric. Plaintiffs objected to the draft for failing to consider reasonable alternatives,

using obsolete data, ignoring the latest EV technology advancements, inflating costs, and misrepresenting benefits. Plaintiffs faulted the Postal Service for failing to examine the impacts or alternatives associated with production of the new fleet, including the selected contractor's decision to create a new production facility for these vehicles. Plaintiffs explained that the Postal Service's plan would cause undisclosed and unexamined adverse environmental and socioeconomic impacts and proposed specific alternatives to reduce those adverse impacts.

8.      EPA also commented on the draft and found that it was "inadequate and preclude[d] meaningful consideration of the proposed action and alternatives." EPA identified and explained in detail specific deficiencies in the Postal Service's selection and analysis of alternatives, economic analysis, air pollutant emission calculations, and consideration of environmental justice. EPA directed the Postal Service to address these deficiencies in a new draft EIS and to make the new draft EIS available for public comment.

9.      Despite these and other comments critical of the draft, the Postal Service issued its final EIS on January 7, 2022. *See* 87 Fed. Reg. 994 (Jan. 7, 2022). The final EIS again selected the 90% maximum gas-powered purchase as the preferred alternative. The Postal Service's analysis concluded that the 100% EV alternative would cost $2.3 to $3.3 billion more than the preferred alternative. The final EIS made only minimal revisions to the draft, and the Postal Service failed to meaningfully respond to substantive comments.

10.     After reviewing the final EIS, EPA concluded that the final EIS "remain[ed] seriously deficient," stated that its "concerns with the draft EIS were not adequately addressed," and found that the EIS was "inconsistent with the requirements of NEPA." EPA again directed the Postal Service to prepare a supplemental EIS to address these flaws. CEQ, which is tasked with implementing NEPA across the entire federal government, echoed the request for a

supplemental EIS and noted that if the Postal Service did not correct the deficiencies through a supplemental EIS that "the Federal courts may compel USPS to alter course."

11.     UAW also submitted comments to the Postal Service after reviewing the final EIS. UAW's comments on the final EIS highlighted how the Postal Service had provided internally inconsistent and illogical justifications for refusing to consider the impacts and alternatives that UAW identified in its comments on the draft EIS. UAW also advised the Postal Service that it cannot lawfully refuse to consider impacts from the production of the vehicles the agency is causing to be built. However, the Postal Service explicitly refused to consider UAW's comments on the final EIS.

12.     On February 23, 2022, the Postal Service issued a ROD based on and incorporating the final EIS, which the Postal Service chose not to revise. 87 Fed. Reg. 14,588, 14,589 (Mar. 15, 2022). The ROD included the Postal Service's responses to EPA's comments on the final EIS, but did not include any response to UAW's comments on the final EIS.

13.     The Postal Service's decision is based on an unlawfully deficient environmental analysis conducted after the Postal Service had already decided on a course of action. If allowed to stand, it would lock in decades of fossil fuel consumption and pollution in communities across the United States, resulting in higher maintenance and fuel costs, worse air quality, and increased climate impacts. If the Postal Service undertook a supplemental environmental analysis, it could reach a different conclusion and instead invest in much-needed EVs that would reduce air pollution, mitigate the causes of climate change, provide union jobs, and save the Postal Service money.

14.     Plaintiffs therefore seek a declaration that the Postal Service's EIS violated NEPA, vacatur of the EIS and the ROD, and injunctive relief preventing the Postal Service from acquiring new vehicles under the contract with Oshkosh until it complies with NEPA.

## JURISDICTION AND VENUE

15.     This case arises under NEPA, 42 U.S.C. §§ 4321-4347; CEQ's NEPA regulations, 40 C.F.R. pts. 1500-1508; and the Postal Service's NEPA regulations, 39 C.F.R. pt. 775.

16.     The Postal Reorganization Act (PRA) provides, "except as otherwise provided in this title or insofar as such laws remain in force as rules or regulations of the Postal Service, no Federal law dealing with public or Federal contracts, property, works, officers, employees, budgets, or funds, including the provisions of chapters 5 and 7 of title 5, shall apply to the exercise of the powers of the Postal Service." 39 U.S.C. § 410(a).

17.     The PRA "does not exempt the [Postal] Service from NEPA and . . . the [Postal] Service must comply with the requirements of that statute." *Chelsea Neighborhood Ass'ns v. U.S. Postal Serv.*, 516 F.2d 378, 386 (2d Cir. 1975).

18.     Plaintiffs have a cause of action to challenge the Postal Service's violations of NEPA and the applicable regulations under the Administrative Procedure Act (APA) or, in the alternative, under the doctrine of nonstatutory review, as arbitrary and capricious, contrary to law, unsupported by reasoned decision-making, unsupported by a contemporaneous justification, and/or in exceedance of the Postal Service's statutory authority. *See, e.g.*, *id.*

19.     The Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) and 39 U.S.C. §§ 401(1), 409(a) (PRA).

20.     The PRA's "sue-and-be-sued clause waives immunity, and makes the Postal Service amenable to suit, as well as to the incidents of judicial process." *U.S. Postal Serv. v. Flamingo Industries (USA) Ltd.*, 540 U.S. 736, 744 (2004) (citing 39 U.S.C. § 401).

21.     The Court has the authority to issue the requested declaratory and injunctive relief. *See* 28 U.S.C. §§ 2201-2202 (authorizing federal courts to issue declaratory relief and further necessary or proper relief).

22.     The challenged agency action is final.

23.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(e)(1) because defendant Louis DeJoy is an officer or employee of the United States acting in his official capacity, the Postal Service is an agency of the United States, plaintiff NRDC resides in the District, and no real property is involved in the action.

## PARTIES

24.     Plaintiff NRDC is a national, nonprofit environmental membership organization whose purpose is to safeguard the Earth—its people, its plants and animals, and the natural systems on which all life depends. NRDC was founded in 1970 and is organized under the laws of the State of New York. NRDC has over 325,000 members nationwide, over 26,000 of whom live in New York. NRDC is working to solve the most pressing environmental issues we face today, including environmental injustice, air pollution, and climate change.

25.     NRDC advocates for the adoption of EVs to fight climate change, ameliorate local pollution, and ensure equitable access to beneficial technology. In its work, NRDC supports policies that provide incentives to make EVs more affordable, that integrate EVs into the power grid, and that encourage the federal government to acquire EVs. NRDC has pushed for programs in seven states—covering 25 percent of the new car market—to encourage the purchase of 3.3

million new EVs in the next decade, starting with the Charge Ahead California initiative. NRDC

is also a member of the EV Charging Initiative, which collaborates across industry, public

interest groups, and labor organizations to accelerate the adoption of EV charging infrastructure.

26.     NRDC members live, work, and recreate near post offices, postal service carrier

annexes, and roads used by Postal Service delivery trucks that will be affected by the Postal

Service's environmental analysis of and decision whether or not to acquire EVs. For instance,

NRDC members engage in gardening, biking, running, walking, observing wildlife, and

beekeeping, at or near their homes where they receive mail and packages from postal delivery

vehicles or near post offices or postal service carrier annexes where postal delivery vehicles are

frequently located. Furthermore, NRDC members have interests in the environmental quality in

and around their homes, places of work, neighborhoods, and parks, including local air quality

and noise pollution, which will be affected by the Postal Service's decision.

27.     Among the affected NRDC members is Dave Potenziani in Durham, North

Carolina. Mr. Potenziani, who currently owns his second EV, hears and smells the postal

delivery trucks where he lives, including on walks along roads in his neighborhood, and finds the

smell of exhaust from them an offensive odor that contributes to pollution. Mr. Potenziani also

lives near a state park on the Eno River, where he can still hear and smell vehicle traffic from the

road, including postal delivery trucks that use the roads for delivery routes, while hiking.

Another NRDC member, Lindsay Wilkes, lives in a wooded neighborhood in Chapel Hill, North

Carolina, where she works from home. Ms. Wilkes spends time each day outdoors gardening and

exercising. She often sees, hears, and smells the Postal Service delivery truck on her street or

while out running or walking, sometimes more than once a day or on Sundays. Ms. Wilkes also

notices that the Postal Service truck's fumes tend to linger and smell like old lawn equipment.

28.     NRDC also has members who live, work, and recreate in areas that are in non-attainment for 8-hour ozone under the Clean Air Act's National Ambient Air Quality Standards (NAAQS). One such member is Nancy Marks, who lives in Montclair in Essex County, New Jersey. Essex County is a non-attainment area for 8-hour ozone. Ms. Marks, who is 67 years old, goes for a brisk four-mile walk in her neighborhood almost every day. On these walks, she almost always sees multiple postal delivery trucks, and her route also takes her past a Post Office used by many delivery vehicles that is a half mile from her home. It bothers her when postal delivery vehicles are running along her route because of their cumulative impact with other delivery vehicles. Ms. Marks is a retired environmental attorney for NRDC and is familiar with ozone non-attainment areas, knows that nitrogen oxides emitted by internal combustion engines cause ground-level ozone, and is aware of health effects of ground-level ozone for older adults and people who are active outdoors, such as her. A new NEPA analysis that could result in the replacement more of the Postal Service's fleet with EVs would help move the area where she lives toward attainment on 8-hour ozone by reducing emissions of ozone precursors from gasoline-burning engines.

29.     The Postal Service's flawed NEPA analysis harms these and other NRDC members' health, environmental, aesthetic, and recreational interests. A new analysis that could result in the replacement more of the Postal Service's fleet with EVs would ameliorate these exposures to exhaust and noise from gas-powered delivery vehicles.

30.     Plaintiff UAW is one of the largest and most diverse labor unions in North America, with over 400,000 active members and more than 600 local unions. UAW works to ensure that its members earn fair wages and experience fair labor standards and safe working conditions. UAW also has longstanding interests in advancing social and environmental justice

on behalf of itself and its members. For example, UAW has been actively engaged in every civil rights battle since the 1950s and has played an important role in the passage of landmark legislation such as the Occupational Safety and Health Act. On behalf of its members, UAW regularly works to promote the production of vehicles at union shops.

31.     UAW also has a longstanding interest in protecting the environment. For example, under the leadership of its longest-serving president, Walter Ruther, the UAW was instrumental in the establishment and organization of the first Earth Day in 1970. Today, the union continues its legacy of environmental advocacy through UAW's Community Action Program Councils, where its members engage in environmental protection activities to improve the social conditions of its members and for society. UAW has more than 100 such Councils across the country. UAW also continues this environmental work through participation in policy-making and decision-making by federal agencies that may affect the environment, the union, and its members. To that end, UAW submitted comments on the Postal Service's draft EIS and final EIS highlighting the adverse environmental and socioeconomic impacts from the Postal Service's plan and proposing specific alternatives to reduce such impacts.

32.     UAW and its members have an interest in contributing to the mitigation of climate change and in reducing the adverse impacts of climate change on its members and their communities through the production of EVs. UAW and its members believe that producing EVs is a critical tool for reducing carbon emissions from the transportation sector. Moreover, UAW and its members believe that producing EVs through unionized labor is the best means to ensure that electric vehicles are produced in a manner that protects the interests of workers, their families, and their communities.

33.     Many of UAW's members live and work in cities and neighborhoods that have been adversely impacted by manufacturers relocating jobs to other areas where employers pay workers less and where workers have fewer protections against unsafe or inequitable working conditions. Such adverse impacts can include the closure of manufacturing facilities and businesses and the abandonment of homes, all of which cause adverse impacts to local environments, public safety, and residents' aesthetic interests.

34.     UAW members have aesthetic and recreational interests in seeing union-built automobiles on the roads in their neighborhoods. UAW members take significant pride in their work and enjoy seeing the automobiles they produce. Hence, in addition to a professional interest in producing the Postal Service's new vehicles, UAW's members also have an aesthetic and recreational interest in seeing union-built Postal Service vehicles delivering mail to their homes and in their neighborhoods.

35.     The Postal Service's decision at issue and its flawed NEPA process harm the interests of UAW and its members. By deciding to produce a new fleet of overwhelmingly gas-powered vehicles, the Postal Service's decision harms UAW's interest in mitigating climate change through the production of EVs. By signing and funding a contract that sends a large number of jobs to a new facility not covered by a collective bargaining agreement—and by refusing to disclose this decision, analyze its impacts, or analyze any alternatives with fewer socioeconomic impacts—the Postal Service harmed UAW's interest in promoting good socioeconomic outcomes by ensuring that vehicles are produced at union shops. Because the Postal Service's decision will result in the production of vehicles at a new, unorganized location, the agency's decision will also harm the aesthetic and recreational interests of UAW members in seeing union-built Postal Service vehicles delivering mail to their homes and in their

neighborhoods. Finally, by making a decision that results in jobs that could have been performed in existing unionized facilities instead being sent to a state with the lowest unionization rate in the nation, the Postal Service's decision harms UAW's interest in promoting the production of vehicles at unionized shops, and makes it more likely that the communities where UAW members live and work may experience adverse environmental and socioeconomic impacts associated with employers moving jobs to areas where workers earn less and endure worse working conditions.

36.     Defendant Postal Service is "an independent establishment of the executive branch of the Government of the United States." 39 U.S.C. § 201. The Postal Service may be sued in its official name. *Id.* § 401(1).

37.     Defendant Louis DeJoy is sued in his official capacity as Postmaster General. The Postmaster General is the chief executive officer of the Postal Service. *Id.* § 203.

## LEGAL BACKGROUND

### The National Environmental Policy Act and Implementing Regulations

38.     The purposes of NEPA are to "encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation." 42 U.S.C. § 4321.

39.     Under NEPA, "it is the continuing policy of the Federal Government . . . to use all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under

which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans." *Id.* § 4331(a).

40.     The statute's "twin aims" are to require agencies to "consider every significant aspect of the environmental impact of a proposed action" and to inform the public of these environmental impacts. *Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97 (1983) (quotation marks omitted).

41.     Agencies must comply with NEPA for any "major Federal action[] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

42.     Agencies should begin the NEPA process "at the earliest reasonable time to ensure that agencies consider environmental impacts in their planning and decisions." 40 C.F.R. § 1501.2(a).

43.     If the proposed action is "likely to have significant effects," then the agency should prepare an environmental impact statement, or EIS. *See id.* § 1501.3(a)(3).

44.     The EIS "shall be prepared early enough so that it can serve as an important practical contribution to the decision-making process and will not be used to rationalize or justify decisions already made." *Id.* § 1502.5.

45.     The purpose of an EIS "is to ensure agencies consider the environmental impacts of their actions in decision making. It shall provide full and fair discussion of significant environmental impacts and shall inform decision makers and the public of reasonable alternatives that would avoid or minimize adverse impacts or enhance the quality of the human environment." *Id.* § 1502.1.

46.     The EIS must include a "detailed statement" of environmental impacts of the proposed action, alternatives to the proposed action, adverse environmental impacts that cannot

be avoided should the proposal be implemented, and any irretrievable commitments of resources. *See* 42 U.S.C. § 4332(2)(C).

47.     Agencies must address submitted comments in final EISs. *See* 40 C.F.R. § 1502.9.

48.     The EIS must "present the environmental impacts of the proposed action and the alternatives." *Id.* § 1502.14. The agency must "[e]valuate reasonable alternatives to the proposed action," "briefly discuss the reasons for [the] elimination" of any alternatives eliminated from detailed study, and "[d]iscuss each alternative considered in detail, including the proposed action, so that reviewers may evaluate their comparative merits." *Id.*

49.     "Effects or impacts means changes to the human environment from the proposed action or alternatives that are reasonably foreseeable and have a reasonably close causal relationship to the proposed action or alternatives including those effects that occur at the same time and place as the proposed action or alternatives and may include effects that are later in time or farther removed in distance from the proposed action or alternatives." *Id.* § 1508.1(g). "Effects include ecological . . . , aesthetic, historic, cultural, economic (such as the effects on employment), social, or health effects." *Id.* § 1508.1(g)(1).

50.     The EIS must include an analysis of "environmental consequences" that "forms the scientific and analytic basis for the comparisons" for the alternatives analysis. *Id.* § 1502.16(a). The section must include descriptions of the "environmental impacts of the proposed action and reasonable alternatives to the proposed action and the significance of those impacts," any "adverse environmental effects that cannot be avoided should the proposal be implemented," any "irreversible or irretrievable commitments of resources," the "[e]nergy requirements and conservation potential of various alternatives and mitigation measures," the

"[m]eans to mitigate adverse environmental impacts," and, if "applicable, economic and technical considerations, including the economic benefits of the proposed action." *Id.*

51.     Agencies must "use . . . reliable existing data and resources" and "identify any methodologies used and shall make explicit reference to the scientific and other sources relied upon for conclusions in the statement." *Id.* § 1502.23.

52.     When an agency considers a cost-benefit analysis for a proposed action to determine what choice to make, "the agency shall incorporate the cost-benefit analysis by reference or append it to the statement as an aid in evaluating the environmental consequences." *Id.* § 1502.22.

53.     Both draft and final EISs shall be published. *Id.* § 1502.20.

54.     The agency is required to "consider substantive comments" received on the draft EIS. *Id.* § 1503.4(a). The agency may modify its analysis, such as by changing alternatives, adding new alternatives, supplementing its analysis, or correcting facts in response to comments. *Id.*

55.     When an agency makes a decision, it must publish a record of decision that "state[s] the decision" and also identifies "alternatives considered by the agency in reaching its decision." *Id.* § 1505.2(a)(1)-(2). The agency must also "identify and discuss all such factors, including any essential considerations of national policy, that the agency balanced in making its decision and state how those considerations entered into its decision." *Id.* § 1505.2(a)(2). Furthermore, the agency must state whether it "has adopted all practicable means to avoid or minimize environmental harm from the alternative selected, and if not, why the agency did not." *Id.* § 1505.2(a)(3).

56.     "Federal agencies may not make or issue a record of decision . . . until . . . 30 days

after the notice . . . for a final environmental impact statement." *Id.* § 1506.11(b)(2). Members of

the public "may make comments consistent with the time periods under [40 C.F.R.] § 1506.11."

*Id.* § 1503.1(b).

57.     Until an agency issues its record of decision, "no action concerning the proposal

may be taken that would: (1) [h]ave an adverse environmental impact; or (2) [l]imit the choice of

reasonable alternatives." *Id.* § 1506.1(a).

58.     EPA is required to "review and comment in writing on the environmental impact

of . . . any major Federal agency action" to which NEPA applies. 42 U.S.C. § 7609(a). Those

comments must be made public. *Id.*

59.     The standard by which courts review an agency's compliance with NEPA is

whether the agency's analysis and decision were arbitrary, capricious, or an abuse of discretion,

or contrary to law, or whether they were in excess of the agency's authority. *See, e.g.*, *Chelsea

Neighborhood Ass'ns*, 516 F.2d at 387 n.23.

**Postal Service's NEPA Regulations**

60.     The Postal Service is not exempt from NEPA and it "must comply with the

requirements of that statute." *Chelsea Neighborhood Ass'ns*, 516 F.2d at 386.

61.     The Postal Service has promulgated regulations implementing NEPA, *see* 39

C.F.R. pt. 775, and CEQ's general NEPA regulations, 39 C.F.R. § 775.1 (citing 40 C.F.R.

pt. 1500).

62.     The Postal Service declared that it developed this EIS "[p]ursuant to the

requirements of the National Environmental Policy Act of 1969 (NEPA), its implementing

procedures at 39 CFR 775, and the President's Council on Environmental Quality Regulations

16

(40 CFR parts 1500-1508)." 87 Fed. Reg. at 994; *see also* 86 Fed. Reg. 12,715, 12,715 (Mar. 4, 2021) (notice of "intent of the U.S. Postal Service, pursuant to the requirements of" NEPA and its implementing regulations "to prepare an EIS to evaluate the environmental impacts of the proposed action" and an alternative).

63.     The Postal Service's NEPA regulations adopted the factors identified in CEQ's NEPA regulations to determine when to prepare an EIS. 39 C.F.R. § 775.5(a).

64.     Under the Postal Service's NEPA regulations, "[p]roposed actions should be assessed as soon as their effects can be meaningfully evaluated, to provide the bases for early decision on whether detailed environmental impact statements must be prepared." *Id.* § 775.8(a)(3). The Postal Service is required to "[s]tudy, develop, describe, and evaluate at all decision points, reasonable alternatives to recommended actions which may have a significant effect on the environment." *Id.* § 775.8(a)(4).

65.     The Postal Service's NEPA regulations declare that the alternatives analysis is "vitally important." *Id.* § 775.11(c)(5). The alternatives and their impacts should be "presented in comparative form, thus sharply defining the issues and providing a clear basis for choosing alternatives." *Id.*

66.     To compare alternatives, the EIS "must" "[e]xplore and evaluate all reasonable alternatives, including the 'no action' alternative, and briefly discuss the reasons for eliminating any alternatives" and "[d]evote substantial treatment to each alternative considered in detail, including the proposed action, so that reviewers may evaluate their comparative merits." *Id.* § 775.11(c)(5)(i)-(ii).

67.     "For each reasonable alternative, each affected element of the environment must be described, followed immediately by an analysis of the impacts (environmental

consequences)." *Id.* § 775.11(c)(6). Among other impacts, the analysis must include: "(i) Any

adverse environmental effects which cannot be avoided should the action be implemented,

(ii) The relationship between short-term uses of the environment and the maintenance and

enhancement of long-term productivity, (iii) Any irreversible or irretrievable commitments of

resources should the action be implemented, and (iv) Energy requirements and conservation; and

natural, or depletable, resource requirements and conservation." *Id.*

68.     The EIS must include a "List of Mitigation Measures." *Id.* § 775.11(c)(7).

69.     The EIS "must . . . [s]erve to assess the environmental impact of proposed actions,

rather than to justify decisions already made." *Id.* § 775.11(b)(2)(vi).

70.     The final EIS must include responses to comments. *Id.* § 775.11(e). In response to

comments, the Postal Service may modify alternatives, develop new alternatives, supplement or

improve analyses, or correct facts. *Id.*

71.     A supplemental EIS "must be issued if . . . [s]ignificant new . . . information

bearing on environmental impacts of the proposed action arise[s] or [is] discovered." *Id.*

§ 775.11(f).

72.     A Postal Service record of decision "may not be made until . . . 30 days after

publication of the notice for a final" EIS. *Id.* § 775.12(b).

## FACTUAL AND PROCEDURAL BACKGROUND

### The Existing Postal Service Fleet

73.     The Postal Service owns and operates "one of the world's largest civilian

government fleets consisting of approximately 212,000 active delivery vehicles," most of which

were purpose-built for the agency. EIS at 1-1, 2-1. The current fleet includes about 135,000 of

the purpose-built, right-hand drive, light-duty delivery vehicles that are known as "Long-Life Vehicles" or "LLVs." *Id.* at 2-1.

74.     These vehicles have exceeded their expected service lives, and lack basic features such as airbags and anti-lock brakes. *See id.* at 2-1 to 2-2.

75.     Long-Life Vehicles average about $5,000 in annual maintenance costs per vehicle. *Id.* at C-2.

76.     Total annual maintenance costs for Long-Life Vehicles have exceeded $700 million.

77.     The current purpose-built Postal Service Long-Life Vehicles have a fuel efficiency of 8.2 miles per gallon (mpg). *Id.* at G-2. The Postal Service estimates the total annual gasoline usage for Long-Life Vehicles is over 97 million gallons. *Id.*

78.     The Postal Service's Long-Life Vehicles were manufactured between 1987 and 1994. *Id.* at 2-1. Current delivery needs—including increases in parcels and decreases in letter volume—no longer match the capabilities of the purpose-built Long-Life Vehicles. *Id.* at 4-3. As a result, the Postal Service has decided to replace this aging fleet with new delivery vehicles.

79.     In addition to replacing roughly 126,000 Long-Life Vehicles, the Postal Service also proposes to replace about 39,000 other vehicles in its fleet. EIS at G-2, tbl. G-1. The Postal Service estimates the combined gasoline usage for all 165,000 vehicles slated for replacement to be over 135 million gallons annually. *Id.*

**Mitigating the Impacts of Air Pollution and Climate Change with Electric Vehicles**

80.     The transportation sector accounts for the largest share of annual greenhouse gas emissions in the United States. Transportation emissions are primarily from burning fossil fuels, typically gasoline, to power vehicles with internal combustion engines.

81.     Internal combustion engine vehicles also emit other air pollutants. These emissions increase ambient levels of air toxics, lead to the formation of smog, and cause health impacts from reduced air quality.

82.     Electric vehicles require no gasoline and emit no tailpipe emissions, thereby improving local air quality and eliminating a significant source of greenhouse gas emissions.

83.     Batteries are the most expensive component for electric vehicles, but these costs are rapidly declining. Although the price for batteries was over $1,000 per kilowatt hour in 2010, that amount has already fallen to a global average price of $156 per kilowatt hour. The trend of decreasing battery costs is expected to continue.

84.     Delivery companies are adopting electric vehicles in large numbers. Amazon has ordered 100,000 electric delivery vehicles and UPS has ordered 10,000 electric vehicles. DHL uses zero-emission vehicles for a fifth of its fleet and expects that number to increase. FedEx plans to have a 100 percent electric pickup and delivery fleet by 2040.

85.     Electrification of the postal fleet has been a long time coming. The Postal Service first evaluated electric delivery vehicles in 1900, and in 2000 it announced plans to order 6,000 EVs from Ford, although funding disappeared soon thereafter when the Postal Service refocused its resources on anthrax and bio-terrorist threats in the mail following the September 11, 2001, terrorist attacks.

86.     The rest of the federal fleet is also going electric. The Department of Energy's Federal Energy Management Program provides technical support for federal agencies acquiring EVs and installing supporting infrastructure. Over 35 federal agencies have procured EVs from the U.S. General Services Administration's fleet.

87.     On January 27, 2021, President Biden issued an Executive Order directing development of a federal clean vehicle procurement strategy, including for Postal Service vehicles. Exec. Order. No. 14008, 86 Fed. Reg. 7619, 7624 (Jan. 27, 2021). And on December 8, 2021, President Biden issued an executive order directing the government to acquire zero-emission vehicles exclusively by 2035 and to acquire only zero-emission light-duty vehicles by 2027. Exec. Order. No. 14057, 86 Fed. Reg. 70,935, 70,935 (Dec. 13, 2021).

**Postal Service Delivery Vehicle Acquisition and NEPA Process**

88.     On January 20, 2015, the Postal Service issued a request for information on replacing its delivery fleet. EIS at 1-2. It then ordered prototypes based on manufacturers' bids for internal combustion, hybrid, and plug-in electric vehicles. *Id.*

89.     On December 27, 2019, the Postal Service issued a request for proposals to the five prototype suppliers. *Id.* at 1-3.

90.     On February 23, 2021, and prior to the release of either a draft or final EIS, the Postal Service announced that it had selected Oshkosh Defense for a ten-year contract to produce up to 165,000 new vehicles, beginning in 2023. *See* Press Release, Postal Service U.S. Postal Service Awards Contract to Launch Multi-Billion-Dollar Modernization of Postal Delivery Vehicle Fleet (Feb. 23, 2021).

91.     Only after the award of the contract did the Postal Service belatedly publish its notice of intent to prepare an EIS. *See* 86 Fed. Reg. 12,715, 12,715 (Mar. 4, 2021).

92.     The Postal Service described its selection process as based on an evaluation of design quality and technical application; supplier capability; and past performance. EIS at 1-3.

93.     The Postal Service declined to select contract finalists that proposed hybrid or electric vehicles.

94.     The Postal Service's contract with Oshkosh for the production of vehicles includes a "special provision" on NEPA. It states the "Postal Service is required to comply with the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321, *et seq.*"

95.     The contract's "special provision" on NEPA indicates the "Postal Service's obligation to order the minimum quantity identified in this solicitation is expressly contingent upon the satisfactory completion of the NEPA EIS process. Any resulting contract(s) awarded pursuant to this solicitation shall reflect this contingency."

96.     In the description of goods or services to be provided, the contract states that the "Postal Service's obligation to order the minimum quantity identified in this contract is expressly contingent upon the satisfactory completion of the NEPA EIS process in accordance with SPECIAL PROVISION: THE NATIONAL ENVIRONMENTAL POLICY ACT (NEPA)."

97.     The Postal Service's 2019 request for proposals also included the same "special provision" on NEPA.

98.     The Postal Service issued an initial task order under its contract with Oshkosh committing $482 million in February 2021 for research and development and modifications to assembly line set-up. The order covers the period until August 2023. As the Postal Service's final EIS describes, "[a]t the time of awarding the contract [on February 23, 2021], the Postal Service placed an order that funds the production design, assembly tooling, and factory start-up costs." EIS at 1-3.

99.     Oshkosh announced in June 2021 that it plans to spend $155 million on a dedicated facility in Spartanburg, South Carolina, to manufacture postal delivery vehicles under the contract.

100.    Oshkosh leases a facility at 789 Flatwood Industrial Drive, Spartanburg, South
Carolina, for this purpose. It began the lease in the second quarter of 2021, which was after the
Postal Service made its initial task order.

### Draft Delivery Vehicle EIS

101.    On August 26, 2021, the Postal Service released a draft EIS analyzing potential
delivery vehicle replacements for public review and comment. 86 Fed. Reg. 47,662 (Aug. 26,
2021).

102.    The draft EIS's preferred alternative was to purchase up to 90% internal
combustion engine vehicles over ten years; the remainder (a minimum of 10%) would be EVs.

103.    The Postal Service acknowledged in the draft EIS that it had already awarded the
contract to Oshkosh for the production of new delivery vehicles. DEIS at 1-4. The draft EIS did
not disclose that Oshkosh had already determined that vehicles would be produced in South
Carolina.

104.    Based in part on an assumption that an EV designed specifically for the Postal
Service would have a range of 70 miles on a single charge, the draft EIS projected that all but
roughly 12,500 (or about 5%) of postal delivery routes nationwide could be served by EVs.
DEIS at 3-2.

105.    For commercially available "off the shelf" EVs, the draft EIS considered only
left-hand-drive vehicles, *see id.* at 4-12, which it rejected on the grounds these vehicles would
not meet the purpose and need because these left-hand-drive vehicles could not support curb-side
delivery, *id.* at 4-37. The Postal Service explained that it did not consider right-hand-drive
commercially available "off the shelf" vehicles on the grounds that they were not currently
available or marketed for future development.

106.    NRDC submitted comments in October 2021, criticizing the Postal Service for selecting a preferred alternative guaranteeing that only 10% of new delivery vehicles will be electric, and thereby missing an opportunity to increase the number of EVs in the Postal Service's fleet. NRDC faulted the draft EIS for failing to consider reasonable alternatives, using obsolete data, ignoring the latest EV technology advancements, inflating costs, and misrepresenting benefits.

107.    UAW submitted comments in October 2021, criticizing the Postal Service for failing to rigorously examine the impacts of its proposed plan and for failing to consider reasonable alternatives that would reduce adverse impacts. For example, UAW explained that because the Postal Service's decision to order custom-built vehicles will cause those vehicles to be produced, the agency should have analyzed the environmental and socioeconomic impacts associated with producing vehicles. Likewise, UAW explained that the Postal Service must disclose and analyze the impacts associated with Oshkosh's new manufacturing facility in South Carolina. Further, UAW stressed that because employees in South Carolina are far less likely to enjoy the protections that a labor union provides—such as better wages and working conditions—the Postal Service must disclose and analyze the social and socioeconomic impacts related to the location where its vehicles will be produced.

108.    UAW's comments on the draft EIS also proposed reasonable alternatives that could reduce the adverse environmental impacts from the Postal Service's proposed action, including such alternatives as: (1) a requirement that vehicles be produced at an existing manufacturing facility; (2) a requirement that vehicles be produced at a facility with a strong track record of compliance with environmental laws; or (3) a requirement that vehicles be produced at a unionized facility.

109.    UAW's comments on the draft EIS also advised the Postal Service that funding Oshkosh's new manufacturing facility in South Carolina both caused adverse environmental impacts and limited the choice of reasonable alternative locations for the production of its vehicles, and thus violated NEPA and its implementing regulations.

110.    EPA also commented on the draft EIS and found that it was "inadequate and preclude[d] meaningful consideration of the proposed action and alternatives." EPA, Comment Letter on Draft EIS (Oct. 21, 2021); EIS at B-9 to B-21. EPA concluded it "did not believe a proper analysis was conducted" and explained "there was never an evidence-based careful consideration of the merits of each alternative." *Id.*

111.    Based on the flaws EPA identified, it asked the Postal Service to revise the draft EIS and make it available again for public comment in a supplemental draft EIS.

112.    EPA included an attachment with detailed technical comments. EPA explained that the Postal Service did not include an adequate range of alternatives and relied on substantial inadequacies in its economic analysis to compare alternatives. According to EPA, the Postal Service's economic analysis did not meet the requirements of 40 C.F.R. § 1502.23 for methodology and scientific accuracy, thereby causing the estimates for total cost of ownership to be unsound and counter to industry trends. Additionally, EPA identified deficiencies in the analysis of greenhouse gas emissions and a failure to consider adaptation to climate change, indirect effects of the proposed action, or environmental justice impacts.

**Final Delivery Vehicle EIS**

113.    The Postal Service issued its final EIS on January 7, 2022. *See* 87 Fed. Reg. 994 (Jan. 7, 2022).

114.    The purpose of the action was to "replace the end-of-life and high-maintenance LLVs and [other purpose-built delivery vehicles] with vehicles with more energy-efficient powertrains, updated technology, reduced emissions, increased cargo capacity and improved loading characteristics, improved ergonomics and carrier safety, and reduced maintenance costs." EIS at 2-1. The number of vehicles to be acquired was up to 165,000.

115.    To accomplish this purpose, the final EIS again selected the acquisition of up to 90% internal combustion engines as the preferred alternative.

116.    The final EIS included consideration of four alternatives, in addition to the no-action alternative: (1) purpose-built vehicles consisting of at least 10% EVs and up to 90% combustion engines; (2) purpose-built vehicles consisting of 100% EVs; (3) 100% commercially available right-hand-drive combustion engine vehicles; and (4) 100% commercially available left-hand-drive EVs. EIS at 3-4 to 3-7.

117.    Two of the supposed alternatives were strawmen. Commercially available EVs could not be used for curbside deliveries because of the location of the steering wheel. The Postal Service therefore quickly rejected this alternative because it could not meet the purpose and need of the analysis. *See id.* at 4-42. And the 100% purpose-built EVs alternative was rejected due to supposed operational constraints on approximately 5% of routes based on assumptions about EV's battery range on a single charge. *See id.* at 3-2.

118.    The Postal Service's analysis concluded that the 100% EV alternative would cost $2.3 to $3.3 billion more than the preferred alternative. According to the Postal Service's total cost-of-ownership calculation for 75,000 vehicles, the total estimated cost of ownership over the expected 20-year lifespan of the vehicles would be $9.3 billion for internal combustion engines, and $11.6 billion for EVs.

26

119.    The Postal Service explained that it considered leasing vehicles, but eliminated that option from detailed analysis. It did not describe any other alternatives considered but not analyzed in detail.

120.    The Postal Service did not provide any reason for evaluating a 90% internal combustion engine and 10% EV mix for the fleet as opposed to any other combination of powertrains.

121.    In the final EIS, the Postal Service claimed that "approximately 12,500 delivery routes" were too long for EVs based on an assumed 70-mile-per-charge range. EIS at 3-2. In the agency's estimate, about 5% of current postal delivery routes could not be served by EVs.

122.    In fact, according to a March 2022 report from the Postal Service Office of Inspector General, only around 2,600 delivery routes are 70 miles or longer. U.S. Postal Serv. Office of the Inspector General, Report No. RISC-WP-22-003, Electric Delivery Vehicles and the Postal Service 6 (2022) [hereinafter "USPS OIG Report"]. These make up about 1.5% of the 177,000 total delivery routes. *Id.*

123.    In the final EIS, the Postal Service added a sentence stating, "While [the delivery routes of 70 miles or longer] are not currently suitable for a [battery EV next generation delivery vehicle], the Postal Service acknowledges that battery technology will improve in the future and these routes may become suitable for a [battery EV] in future years." EIS at 3-2. However, the agency did not change its alternatives analysis because of this acknowledgement. Because of the purported operational constraints on roughly 5% of routes, neither 100% EV alternative could meet the stated purpose and need for the EIS.

124.    The Postal Service did not consider an alternative that would acquire EVs for all routes under 70 miles, despite NRDC's comments and others explicitly suggesting this

alternative. The Postal Service did not consider an alternative that would use hybrids or commercially "off the shelf" electric vehicles with longer battery ranges to serve routes longer than 70 miles.

125.    The Postal Service indicated it would prioritize EVs for longer routes that maximize fuel and maintenance savings; however, it did not explain why it considered those factors as opposed to others, such as local air quality, distribution of EV charging infrastructure, availability of EV incentives, or noise. The analysis also did not indicate where those prioritized routes would be.

126.    The most expensive component for an EV is a battery, but the Postal Service's analysis of EV batteries was flawed in multiple respects. The final EIS used an unsupported assumption that the batteries in electric delivery vehicles would provide a 70-mile-per-charge range. Not only does this static assumption not account for expected advancements in battery technology over the course of the decade-long contract period, but it does not even reflect *current* EV battery technology.

127.    For instance, the commercially available Ford Transit Passenger Van EV has an estimated range of 140 to 170 miles per charge. On information and belief, at some point during the NEPA process, Ford and Oshkosh submitted a joint design based on the Ford Transit Passenger Van to the Postal Service.

128.    The average postal delivery route is 21.05 miles.

129.    The Postal Service also did not adequately explain why it failed to consider the cost savings from using two different batteries in vehicles—a smaller, less expensive battery for shorter routes and a larger, more expensive battery for larger routes. Although the Postal Service claimed that considering multiple batteries would limit its flexibility, it did not explain how or

28

why that would be true, and it left unanswered questions such as how many routes could be served by a smaller battery or how considering two battery sizes might change the total cost of ownership.

130.    The final EIS indicated the per-vehicle cost of installing EV charging infrastructure would be between $18,740 and $20,970. EIS at C-4. These numbers were not included in the draft EIS.

131.    According to a March 2022 report by the Postal Service Inspector General, a more accurate per-vehicle estimate for the installation of chargers, including make-ready costs, would be $7,300. USPS OIG Report 11.

132.    According to the Inspector General's report, the Postal Service only considered a one-to-one ratio of chargers to vehicles. *Id.* at 10-11. This assumption was not disclosed in the draft or final EIS. Instead, these documents suggested consideration of a lower number of chargers-to-vehicles because the low average route length for EVs would discharge only 20% of each battery and therefore EVs "may not require charging every day." DEIS at 3-2; EIS at 3-2.

133.    A two-to-three or five-to-six charger-to-vehicle ratio would significantly reduce the total cost of ownership for EVs. These ratios would be possible due to shorter routes that do not require delivery vehicles to charge each night.

134.    Despite NRDC and others pointing out the feasibility of a lower charger-to-vehicle ratio, the Postal Service did not consider alternatives with lower charger-to-vehicle ratios and did not take a hard look at the costs and environmental impacts related to charger installation.

135.    The Postal Service Office of Inspector General also identified problems with the calculation of maintenance costs. According to statements made to Congress by a representative

of the Postal Service Office of Inspector General, the Postal Service's total cost-of-ownership model's information on maintenance costs was inconsistent with the Postal Service's representation of those costs in the final EIS. Although the Postal Service stated in the final EIS that EV maintenance costs would be less, according to the Inspector General's review, the total cost-of-ownership model did not reflect these lower costs.

136.    Additionally, the final EIS included unsupported assumptions about gasoline prices. Although the draft EIS did not disclose the assumptions used for these prices, in the final EIS the Postal Service explained that it used a baseline national average of prices in October 2020 of $2.19 per gallon and the reference case from the Energy Information Administration (EIA) to project increases up to $2.55 per gallon by 2040.

137.    The Postal Service's information on gas prices was stale by the time the EIS was prepared. By the time of the notice of intent to prepare an EIS, gasoline prices had already risen to $2.80 per gallon—higher than even the furthest-out projections used by the Postal Service. And prices have risen further since then. By the release of the draft EIS, gasoline prices were $3.04 per gallon. By the release of the final EIS, they were $3.14 per gallon. And by the record of decision, gasoline prices were $3.41 per gallon. The Postal Service also relied on only one EIA projection, rather than considering the multiple EIA projections that address the range of potential volatility in gasoline prices.

138.    The Postal Service's emissions analyses for both internal combustion engines and EVs were also faulty. According to EPA's analysis, the internal combustion engine delivery vehicles in the preferred alternatives would generate 975,534 metric tons of carbon dioxide per year, more than three times the Postal Service's estimate of 311,739 metric tons. EPA identified this error in its comments on the draft EIS, but the Postal Service did not correct it. And for EVs,

the Postal Service did not consider projected future decreases of carbon intensity in the electric grid or the benefits from distributing EVs in areas with more renewable generation—thereby underestimating environmental benefits from EVs.

139.   EPA's calculations demonstrate that the Postal Service overestimated the greenhouse gas emission reductions, and underestimated the greenhouse gas emission-related costs, of its preferred alternative.

140.   The Postal Service's emissions analysis also did not analyze nitrogen oxides, volatile organic compounds, and particulate matter emissions. Although internal combustion engines emit significant amounts of these pollutants, the Postal Service failed to analyze, monetize, or contextualize the reductions of these pollutants for EV alternatives. The Postal Service did not compare alternatives on air pollution reduction because of its failure to calculate emissions for some air pollutants and its failure to contextualize the benefits or impacts of all air pollutants.

141.   The Postal Service's response to comments dismissed information commenters submitted based on market trends, industry forecasts, or actions of competitors. Instead, the Postal Service insisted that undisclosed information from the procurement process and undisclosed contract information provided sufficiently accurate information.

142.   The Postal Service did not provide the support for or details of much of the information obtained in its procurement process, instead saying that it was balancing NEPA's "hard look" requirement with the protection of "commercially-sensitive information."

143.   The Postal Service also did not respond to any of the substantive comments about trends or projections individually, but instead relied on a blanket dismissal of all submitted data on future trends. For instance, the Postal Service did not engage with EPA's specific comments

on deficiencies in the total cost-of-ownership analysis, but instead explained that the costs were based on the contract that had already been awarded prior to beginning the NEPA process. Of particular importance, the flawed assumptions about battery cost and range were based on the contract with Oshkosh, rather than the current state of technology.

144.     The Postal Service made numerous errors in the economic analysis. It failed to consider trends in EV battery technology, which led it to overestimate the costs of EVs. It used unsupportable assumptions about the future cost of gasoline to understate the costs of combustion vehicles. It vastly overestimated the cost of installing charging infrastructure. It did not account for reduced maintenance costs for EVs.

145.     Instead of addressing the particulars of comments providing industry forecasts, studies, and news reports, the Postal Service relied on a blanket response that the contract-bidding process provided sufficient information for its cost projections. *See* EIS at B-162.

146.     The Postal Service also refused to disclose many of the assumptions used in its total cost-of-ownership analysis. See *id.* at B-161 to B-163, B-165.

147.     The final EIS explained that the Postal Service was not planning to retrofit any internal combustion engines with EV powertrains in the future.

148.     The final EIS did not evaluate commercially available "off the shelf" Class 2b-3 vehicles, which are similar in size to postal delivery vehicles and have currently available models with battery range of 100 miles.

149.     The final EIS did not account for the value of vehicle-to-grid benefits from battery storage capacity of EVs.

150.     The Postal Service stated that it would consider the impacts of its actions on environmental justice communities of concern. However, it included no such analysis.

151.    The final EIS made only minimal revisions to the draft, and the Postal Service failed to meaningfully respond to the comments.

152.    The Postal Service's erroneous cost data, failure to consider reasonably foreseeable trends, and reliance on unsupported assumptions (such as a static 70-mile battery range for EVs throughout the ten-year period of analysis) led it to conclude that "committing to purchase more than 10 percent [EV delivery vehicles] . . . is not achievable, absent additional funding." EIS at *iii*.

153.    UAW submitted comments on the final EIS on February 4, 2022. UAW's comments explained that the Postal Service's final EIS failed to correct the NEPA violations that UAW identified in its comments on the draft EIS. Instead, as UAW explained, the Postal Service provided internally inconsistent and illogical responses to UAW's comments and flatly refused to examine the environmental impacts and alternatives that UAW identified. For example, the Postal Service refused to examine "any impacts or reasonable alternatives associated with the location and methods of production" of the vehicles it ordered because, as the agency claimed, it "has no control or responsibility over the location or manner of production." EIS at B-187. Yet, the agency also inconsistently recognized that it could "impose all manner of restrictions" on the production of these vehicles. *Id.* at B-193. Likewise, the Postal Service refused to consider an alternative that would require production of vehicles to proceed at an existing manufacturing facility because that alternative would ostensibly "come at a cost." *Id.* However, the agency entirely failed to compare this purported additional cost to the $482 million it already spent to allow Oshkosh to create a new manufacturing facility in South Carolina. Similarly, the Postal Service claimed that a contract provision stating that its contract with Oshkosh was "expressly contingent on the Postal Service's satisfactory completion of NEPA" indicated that the agency's

expenditure of $482 million prior to *the commencement* of the NEPA process was somehow unproblematic. Yet, the agency entirely failed to respond to UAW's explanation that this expenditure of hundreds of millions of dollars to enable Oshkosh's new facility in South Carolina both caused adverse environmental impacts and wrongly foreclosed reasonable alternatives in violation of NEPA. Finally, UAW stressed that the Postal Service violated NEPA because it failed to even disclose, much less analyze, the environmental and socioeconomic impacts of Oshkosh producing the agency's vehicles in South Carolina, despite the fact that UAW specifically raised this issue in its comments on the draft EIS.

154.    By email on February 5, 2022, the Postal Service refused to accept UAW's comments on the final EIS. Counsel for UAW responded to the Postal Service on February 7, 2022, thanking the agency for confirming receipt of its comments and explaining, based on the plain text of NEPA's implementing regulations and relevant caselaw, that NEPA does not permit agencies to reject timely submitted public input. The Postal Service did not respond.

155.    EPA submitted a letter on the final EIS concluding that its "review has determined that EPA's concerns with the draft EIS were not adequately addressed and that the final EIS remains seriously deficient." EPA, Comment Letter on Final EIS (Feb. 2, 2022); ROD App. C. The final EIS's "deficiencies render the final EIS inconsistent with the requirements of NEPA and its implementing regulations." *Id.* EPA identified a number of "[k]ey deficiencies" and requested a supplemental EIS be made available for public comment. *Id.*

156.    EPA explained how the award of a contract for the delivery vehicles in advance of the environmental analysis violated NEPA. It also described the Postal Service's total cost-of-ownership analysis as "flawed and out of date," *id.* at 2, explained that the Postal Service

violated requirements to identify methodologies and make explicit reference to sources, and inappropriately limited its choice of alternatives because of the advance award of the contract.

157.    EPA concluded "the Postal Service must supplement its final EIS to cure its infirmities and ensure it meets the basic requirements of NEPA." *Id.*

158.    In support of its letter, EPA provided detailed explanations of the deficiencies in the Postal Service's (1) analysis of total cost of ownership, including gasoline price assumptions and EV cost assumptions; (2) evaluation of greenhouse gas emissions, including underestimation of internal combustion engine emissions and overestimation of EV emissions; (3) discussion of alternatives and mitigation; and (4) consideration of environmental justice.

159.    CEQ also wrote a letter urging the Postal Service to fulfill its NEPA responsibilities. CEQ echoed EPA's "grave concerns with the adequacy of the environmental review" that "warrant further examination" through a supplemental EIS. CEQ, Comment Letter on Final EIS (Feb. 2, 2022).

160.    CEQ explained that the Postal Service "committed to walk down a path before looking to see where that path was leading" by awarding a contract for the delivery vehicles before beginning NEPA review. *Id.* That "approach conflicts with longstanding NEPA practice and law." *Id.*

161.    If the Postal Service failed to address its deficiencies under NEPA, CEQ explained that "the Federal courts may compel [the Postal Service] to alter course." *Id.*

**Record of Decision**

162.    The Postal Service issued the ROD on February 23, 2022. 87 Fed. Reg. at 14,589;

ROD at 1.[1]

163.    The ROD purported to have been "prepared in accordance with the requirements

of the National Environmental Policy Act, the Postal Service's implementing procedures at 39

CFR part 775, and the President's Council on Environmental Quality Regulations (40 CFR parts

1500– 1508)." 87 Fed. Reg. at 14,589.

164.    The ROD indicated the Postal Service had selected the preferred alternative from

the final EIS. The preferred alternative would acquire 50,000 to 165,000 purpose-built, right-

hand drive vehicles over the next ten years, with up to 90% of those new vehicles being internal

combustion engines.

165.    The ROD changed the description of the alternatives considered to recharacterize

the 90% internal combustion engine alternative and the 100% EV alternative as a single

supposed alternative covering all possible combinations between those two powertrain mixes,

which the Postal Service described in the ROD as the "proposed action." However, the Postal

Service nowhere analyzed any of the combinations between these two separate and distinct

alternatives.

166.    In the ROD, the Postal Service argued that the standard requiring the agency to

issue a supplemental EIS under 40 C.F.R. § 1502.9(d)(1) had not been met because EPA had not

presented "significant new circumstances or information relevant to environmental concerns and

bearing on the proposed action or its impacts." ROD at 2, 11. According to the Postal Service,

---

[1] *Available at*
https://uspsngdveis.com/documents/USPS%20NGDV%20Acquisitions%20NEPA%20Record%
20of%20Decision_2.23.22.pdf.

"the additional analyses and mitigation recommendations by EPA would not produce superior information that would significantly alter the relative costs and benefits among the [final EIS's] alternatives, when considered in the context of the requirements necessary to safely and efficiently deliver the nation's mail." ROD at 2. However, the Postal Service then proceeded to provide new justifications for its analysis in response to EPA's letter and request for a supplemental EIS.

167.    The Postal Service's response on the selection of alternatives ignored the suggested alternatives EPA provided in its comments on the draft EIS. *See* ROD at 3 (discussing only the scoping phase and failing to mention the draft EIS phase).

168.    The Postal Service's response also claimed that EPA "mischaracterize[d] the analysis of alternatives" with respect to the Postal Service's conclusion that the 100% EV alternatives were "infeasible," ROD at 3, but did not dispute the substantive reasons why the Postal Service did not select either of those alternatives.

169.    On the fuel efficiency comparison, EPA faulted the Postal Service for the minor improvement of the proposed combustion engine vehicle's 8.6 mpg rating with the use of air conditioning compared to the existing vehicle's 8.2 mpg rating without the use of air conditioning. The Postal Service retorted that EPA's comparison was a "mischaracterization" and claimed a "fairer and more accurate statement" would compare the existing vehicles to the new vehicle's fuel efficiency without the use of air conditioning. ROD at 4.

170.    The Postal Service contested EPA's explanation that the Postal Service's modeling suggested a fuel efficiency of 29.9 mpg, more than double the purported fuel efficiency for proposed vehicles operating without air conditioning. ROD at 5. The Postal Service therefore

did not adopt EPA's suggestions to fix the errors in how the Postal Service used EPA's own model. *Id.* at 5-7.

171.    The Postal Service's modeling analysis also included mismatches between the information used for the number of vehicles compared to the carbon intensity of electricity used in representative county-level and national averages. This mismatch overestimated greenhouse gas emissions for EVs. Using incorrect data for modeling inputs creates inaccurate modeling outputs, which is known as a "garbage in, garbage out" problem.

172.    On the price of gas, the Postal Service relied on stale information. It asserted that all of its analysis used the price of gasoline from October 2020, prior to the scoping phase, draft EIS and public comment period, final EIS, or ROD. The Postal Service admitted these calculations were "used by Postal Service management at the time it determined which supplier" to use for acquiring new vehicles. ROD at 5. That decision point predated the beginning of the NEPA analysis.

173.    Furthermore, the Postal Service argued that any differences in the price of gasoline or electricity would not have "change[d] the fundamental comparisons of [a]lternatives" in the EIS because the difference would be less than the calculated $2.3 billion net differential between a 90% internal combustion fleet and a 100% EV fleet. ROD at 5. That comparison relies on the Postal Service's failure to consider reasonable alternatives and the unjustified and incorrect assumptions in its total cost-of-ownership analysis.

174.    Regarding EPA's assertion that the Postal Service underestimated greenhouse gas emissions based on improper modeling entries, the Postal Service stated that any differences in the analysis would not have affected the agency's decision because it had already acknowledged that EVs would have superior environmental benefits. The Postal Service did not discuss whether

the magnitude of that comparison was relevant to its decision making; rather, it implied the difference was irrelevant.

175.    Instead of engaging with EPA's critique that the Postal Service failed to consider deploying EVs in areas with greater opportunities to achieve emissions reductions, the Postal Service asserted that such a consideration was not a part of its statutory mission. However, NEPA requires consideration of an appropriate range of alternatives.

176.    The ROD included new details on the Postal Service's award of the contract to Oshkosh. Instead of engaging with the substance of the commenters' charge that this award was a violation of NEPA's requirement that agencies not pre-decide matters, the Postal Service responded that EPA had not raised the issue early enough in the NEPA process. However, Plaintiffs and many others did; for example, UAW stressed this issue in comments on both the draft EIS and final EIS. Furthermore, EPA raised a number of issues with assumptions used in the Postal Service's environmental analysis—assumptions that the Postal Service admitted in the ROD were based on the contract awarded to Oshkosh.

177.    The Postal Service has never disclosed the details of Oshkosh's bid or an unredacted version of the contract with Oshkosh. Indeed, while the Postal Service's response to EPA claimed that the agency "has been entirely transparent" about its funding of Oshkosh's South Carolina facility, the agency's EIS never even disclosed that vehicles would be produced there, much less analyzed any resulting environmental and socioeconomic impacts.

178.    Regarding the total cost of ownership for EVs and unjustified assumptions about inputs such as battery cost and range, the Postal Service repeated its justification that it relied on information provided by the contractor in the bidding process rather than industry forecasts,

expert reports, or comparisons to competitors. The Postal Service also attacked one such expert report as biased, without any evidence, instead of engaging with the substance of the report.

179.   Rather than engage with the remaining substance of EPA's letter, the Postal Service dismissed all other issues as "repeat comments" that it did not have to address. *Id.*

180.   The Postal Service again asserted that the ROD had "been prepared in accordance with the requirements of" NEPA, CEQ's NEPA regulations, and the Postal Service's NEPA regulations. *Id.* at 1.

181.   The ROD neither mentioned nor responded to CEQ's letter on the final EIS.

182.   The ROD neither mentioned nor responded to UAW's comments on the final EIS.

183.   The Postal Service's Vice President for Supply Management signed the ROD as the responsible official.

184.   On March 24, 2022, the Postal Service placed an initial delivery order with Oshkosh for 50,000 vehicles, including 39,981 gas-powered delivery vehicles. While the initial delivery order of approximately 10,000 EVs was double the 5,000 EVs the Postal Service projected for the initial order, the Postal Service has not committed to maintaining this one-to-four ratio in future orders. The order costs $2.98 billion.

**FIRST CLAIM FOR RELIEF**
**(Violation of NEPA, USPS Regulations, and CEQ Regulations —**
**Unlawful Issuance of Contract and Commitment of Irretrievable Resources Prior to**
**Analysis of Environmental Impacts)**

185.   Plaintiffs reallege and incorporate Paragraphs 1 through 184.

186.   CEQ regulations instruct agencies to begin the NEPA process "at the earliest reasonable time." 40 C.F.R. § 1501.2(a). These regulations further require that an EIS "not be used to rationalize or justify decisions already made." *Id.* § 1502.5. Likewise, the regulations state that until an agency issues a ROD, "no action concerning the proposal may be taken that

would: (1) [h]ave an adverse environmental impact; or (2) [l]imit the choice of reasonable alternatives." *Id.* § 1506.1(a).

187.    The Postal Service's regulations similarly require that the EIS "[s]erve to assess the environmental impact of proposed actions, rather than to justify decisions already made." 39 C.F.R. § 775.11(b)(2)(vi).

188.    The Postal Service awarded the delivery vehicle contract to Oshkosh and issued an initial $482 million task order in February 2021, prior to beginning the NEPA process. Some of that money covers plant tooling and build-out of a new manufacturing facility, which began in June 2021.

189.    The Postal Service relied on undisclosed cost assumptions from Oshkosh's bid to conduct much of the EIS's analysis. It then made its decision about the proposed action based on these undisclosed cost assumptions.

190.    Although the Postal Service indicated it could cancel or modify the Oshkosh contract based on the outcome of the EIS, it limited the alternatives analysis, assumptions, and data in the EIS based on the award of that contract.

191.    The Postal Service's decision to pay Oshkosh $482 million to enable a new manufacturing facility in South Carolina prior to even issuing a draft EIS both caused adverse environmental impacts and limited the agency's choice of reasonable alternatives.

192.    The Postal Service's award of a contract and issuance of a task order before initiating its NEPA process, and its consequently limited consideration of alternatives, assumptions, and data in its belated EIS, was arbitrary and capricious, did not demonstrate reasoned decision making, was unsupported by a lawful contemporaneous justification, exceeded the Postal Service's authority, and was contrary to NEPA, 42 U.S.C. § 4332(2)(C), CEQ's NEPA

regulations, including 40 C.F.R. §§ 1501.2, 1502.5, 1506.1, and the Postal Service's NEPA regulations, 39 C.F.R. § 775.11.

**SECOND CLAIM FOR RELIEF**
**(Violation of NEPA, USPS Regulations, and CEQ Regulations—**
**Failure to Include and Analyze Reasonable Alternatives)**

193.    Plaintiffs reallege and incorporate Paragraphs 1 through 184.

194.    Each EIS must include "a detailed statement" on "alternatives to the proposed action." 42 U.S.C. § 4332(2)(C).

195.    CEQ regulations require an EIS to "[e]valuate reasonable alternatives to the proposed action," including discussion of the environmental consequences of each alternative and the reasons for elimination of alternatives not considered. 40 C.F.R. § 1502.14. The EIS's consideration of environmental consequences then "forms the scientific and analytic basis for the comparisons" for the alternatives analysis. *Id.* § 1502.16(a).

196.    The Postal Service is bound by its own NEPA regulations to "[s]tudy, develop, describe, and evaluate . . . reasonable alternatives to recommended actions which may have a significant effect on the environment." 39 C.F.R. § 775.8(a)(4). Under Postal Service regulations, the EIS "must" "[e]xplore and evaluate all reasonable alternatives." *Id.* § 775.11(c)(5). This alternatives analysis is "vitally important" and must be "presented in comparative form, thus sharply defining the issues and providing a clear basis for choosing alternatives." *Id.*

197.    The final EIS included only four alternatives for the new fleet: (1) purpose-built vehicles consisting of at least 10% EV and up to 90% combustion engines; (2) purpose-built vehicles consisting of 100% EV; (3) 100% commercially available right-hand-drive combustion engine vehicles; and (4) 100% commercially available left-hand-drive EVs.

42

198.    The Postal Service did not explain why it chose to evaluate only 100% EVs or a mix of 10% EVs and 90% combustion vehicles and not any other combination, despite requests during the public comment period by EPA, NRDC, and others that the Postal Service include other reasonable alternatives.

199.    EPA, NRDC, UAW, and others provided examples of other reasonable alternatives that were not considered. For instance, even including the unjustified assumptions on battery technology relied on by the Postal Service in the EIS that would prevent electrification of roughly 5% of routes, the EIS should have included an alternative for 95% EVs. And EPA recommended that the Postal Service evaluate a "mid-range alternative," such as acquiring 25% EVs and "as high a percentage of [EV delivery vehicles] as is economically feasible." EIS at B-154. UAW likewise proposed alternatives regarding the location and means of production that would reduce adverse environmental and socioeconomic impacts.

200.    The Postal Service did not include alternatives with different charger-to-vehicle ratios, despite NRDC and others commenting on that issue.

201.    The Postal Service's final EIS did not consider any of the alternatives proposed in UAW's comments.

202.    The agency provided no explanation whatsoever for its failure to consider certain alternatives. Although the Postal Service provided nominal justifications for explicitly refusing to consider certain other alternatives, the agency's justifications were internally inconsistent, illogical, or otherwise arbitrary and capricious.

203.    The Postal Service's failure to include and analyze reasonable alternatives was arbitrary and capricious, did not demonstrate reasoned decision making, was unsupported by a lawful contemporaneous justification, exceeded the Postal Service's authority, and was contrary

to NEPA, 42 U.S.C. § 4332(2)(C), CEQ's NEPA regulations, including 40 C.F.R. §§ 1502.14,

1502.16, and the Postal Service's NEPA regulations, 39 C.F.R. §§ 775.8, 775.11.

### THIRD CLAIM FOR RELIEF
**(Violation of NEPA, USPS Regulations, and CEQ Regulations—
Failure to Disclose Assumptions and Take "Hard Look" at
Environmental Impacts and Costs)**

204.    Plaintiffs reallege and incorporate Paragraphs 1 through 184.

205.    NEPA requires agencies to take a "hard look" at environmental consequences

before taking an action. *NRDC v. FAA*, 564 F.3d 549, 556 (2d Cir. 2009) (quoting *Balt. Gas &

Elec.*, 462 U.S. at 97). The EIS "insures the integrity of the agency process by forcing it to face

those stubborn, difficult-to-answer objections without ignoring them or sweeping them under the

rug and serves as an environmental full disclosure law so that the public can weigh a project's

benefits against its environmental costs." *Nat'l Audubon Soc'y v. Hoffman*, 132 F.3d 7, 12

(2d Cir. 1997) (quotation marks omitted). Agencies must therefore provide the data on which

they base their environmental analysis.

206.    CEQ's NEPA regulations embody the hard-look requirement throughout their

provisions, including those defining environmental effects, 40 C.F.R. § 1508.1(g)(1); requiring

informed decision making, *id.* § 1502.1; alternatives analysis, *id.* § 1502.14; evaluation of

environmental consequences, *id.* § 1502.16; methodology and scientific accuracy, *id.* § 1502.23;

if applicable, cost-benefit analysis, *id.* § 1502.22; response to comments, *id.* § 1503.4; and record

of decision, *id.* § 1505.2.

207.    The Postal Service's NEPA regulations similarly require a hard look to "[i]dentify

environmental effects and values in detail, and appraise them in conjunction with economic and

technical analyses." 39 C.F.R. § 775.8(a)(2). The Postal Service does so in an "analytic" EIS that

serves "to assess the environmental impact of proposed actions, rather than justify decisions

already made." *id.* § 775.11(b)(2). The EIS must include an alternatives analysis, *id.*
§ 775.11(c)(5); description of environmental consequences, *id.* § 775.11(c)(6); a list of
mitigation measures, *id.* § 775.11(c)(7); and response to comments, *id.* § 775.11(e). The record
of decision cannot be made until at least 30 days after the final EIS is made available. *Id.*
§ 775.12(b).

208.    The Postal Service failed to take a hard look at air pollutant emissions, including
for nitrogen oxides, volatile organic compounds, and particulate matter. Although internal
combustion engines emit significant amounts of these pollutants, the Postal Service failed to
analyze, monetize, or contextualize the reductions of these pollutants for EV alternatives.

209.    The Postal Service did not compare alternatives on air pollution reduction because
of its failure to calculate emissions for some air pollutants, and it did not contextualize the
benefits or impacts of all air pollutants.

210.    On greenhouse gas emissions, EPA explained that annual carbon dioxide
equivalent emissions from combustion engines were more than three times greater than what the
Postal Service had calculated.

211.    The Postal Service did not correct this error.

212.    Because of these and other errors, the Postal Service failed to rely on scientifically
sound calculations for greenhouse gas emissions, in violation of NEPA regulations. *See* 40
C.F.R. § 1502.23.

213.    The Postal Service also failed to take a hard look at costs, despite weighing these
costs against environmental consequences to reach a decision.

214.    The Postal Service relied on outdated data, including on the cost of gasoline;

failed to disclose assumptions used in calculating the total cost of ownership for vehicles; and

failed to consider industry trends on the cost of components for the vehicles.

215.    The Postal Service failed to consider any impacts associated with the production,

as opposed to the operation, of the custom vehicles that the agency is causing to be built, despite

UAW's comments specifically identifying the need to consider such impacts. For example, the

Postal Service did not consider the different impacts associated with reasonable alternatives,

such as how the impacts of producing custom-designed vehicles may differ from the impacts of

purchasing vehicles that are already commercially available, or how the impacts of producing

gas-powered vehicles may differ from producing EVs. Additionally, the Postal Service did not

consider any impacts related to the production of its new vehicles in South Carolina, such as the

environmental impact of the new manufacturing facility in that state, or the socioeconomic

impacts associated with producing vehicles in a state where workers are far less likely to receive

the protections afforded by labor unions, including better wages and working conditions.

216.    The Postal Service's failures to disclose assumptions and to take a hard look at

emissions of greenhouse gases and other air pollutants, at costs, or at any impacts regarding the

production of its custom vehicles were arbitrary and capricious, did not demonstrate reasoned

decision making, were unsupported by a lawful contemporaneous justification, exceeded the

Postal Service's authority, and were contrary to NEPA, 42 U.S.C. § 4332(2)(C), CEQ's NEPA

regulations, including 40 C.F.R. §§ 1502.1, 1502.14, 1502.16, 1502.22, 1502.23, 1503.4, 1505.2,

and the Postal Service's NEPA regulations, 39 C.F.R. §§ 775.8, 775.11, 775.12.

**FOURTH CLAIM FOR RELIEF**
**BROUGHT ON BEHALF OF UAW ONLY**
**(Violation of NEPA, USPS Regulations, and CEQ Regulations—**
**Failure to Reasonably Respond to Comments)**

217. UAW realleges and incorporates Paragraphs 1 through 184.

218. Informed public participation is a cornerstone of the NEPA process. "The informational role of an EIS is to give the public assurance that the agency has indeed considered environmental concerns in its decisionmaking process and, perhaps more significantly, provide a springboard for public comment in the agency decisionmaking process itself." *Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 768 (2004) (cleaned up). "The purpose here is to ensure that the larger audience can provide input as necessary to the agency making the relevant decisions." *Id.*

219. CEQ's regulations implementing NEPA provide that "agencies or persons may make comments consistent with the time periods under § 1506.11 of this chapter." 40 C.F.R. § 1503.1(b). In turn, the regulations also specify that agencies "may not make or issue a record of decision" until "30 days after the notice . . . for a final environmental impact statement." *Id.* § 1506.11. The regulations allow EPA, and only EPA, to reduce that time period. *Id.* § 1506.11(e).

220. UAW timely submitted comments on the Postal Service's final EIS within the 30-day period prior to the agency's issuance of its ROD, pursuant to CEQ's regulations. 40 C.F.R. §§ 1503.1(b), 1506.11.

221. The Postal Service unlawfully refused to accept or consider UAW's comments on the final EIS. The Postal Service provided no reasoning or justification for refusing to consider UAW's comments on the final EIS while considering and responding to EPA's similar comments on the final EIS, despite the fact that UAW submitted its comments only two days

after EPA's initial letter regarding the final EIS (and three days before EPA submitted errata to that initial letter).

222.    The Postal Service's failure to reasonably respond to comments was arbitrary and capricious, did not demonstrate reasoned decision making, was unsupported by a lawful contemporaneous justification, exceeded the Postal Service's authority, and was contrary to NEPA, 42 U.S.C. § 4332(2)(C), CEQ's NEPA regulations, including 40 C.F.R. §§ 1503.1(b), 1506.11, and the Postal Service's NEPA regulations, 39 C.F.R. § 775.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

a)    Declare the Postal Service violated the National Environmental Policy Act and implementing regulations;

b)    Declare that the Postal Service has not satisfactorily completed the NEPA process;

c)    Vacate the Environmental Impact Statement and Record of Decision, and remand those actions to the agency until and unless it issues a new Environmental Impact Statement and Record of Decision that fully comply with NEPA and any other applicable laws;

d)    Enjoin the Postal Service from acquiring new delivery vehicles under the contract with Oshkosh until Defendants have demonstrated compliance with NEPA and applicable regulations;

e)    Provide for such other relief as the Court deems just and appropriate.

Dated: April 28, 2022                    Respectfully Submitted,

                                       */s/ Francis W. Sturges, Jr.*
                                       FRANCIS W. STURGES, JR.
                                       (*Pro Hac Vice* applicant)
                                       Natural Resources Defense Council

20 N. Wacker Dr., Suite 1600
Chicago, IL 60606
Tel: (312) 847-6807
Email: fsturges@nrdc.org

THOMAS ZIMPLEMAN
(*Pro Hac Vice* applicant)
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, DC 20005
Tel: (202) 513-6244
Email: tzimpleman@nrdc.org

KATHERINE DESORMEAU
(*Pro Hac Vice* applicant)
Natural Resources Defense Council
111 Sutter Street, 21st Floor
San Francisco, California 94104
Tel: (415) 875-6158
Email: kdesormeau@nrdc.org

*Counsel for NRDC*


 */s/ William N. Lawton (by permission)*
WILLIAM N. LAWTON
(*Pro Hac Vice* applicant)
DC Bar No. 1046604
Eubanks & Associates, PLLC
1629 K Street NW
Suite 300
Washington, D.C. 20006
Tel: (202) 556-1243
Email: nick@eubankslegal.com

WILLIAM S. EUBANKS II
(*Pro Hac Vice* applicant)
DC Bar No. 987036
Eubanks & Associates, PLLC
1629 K Street NW
Suite 300
Washington, D.C. 20006
Tel: (970) 703-6060
Email: bill@eubankslegal.com

*Counsel for UAW*